# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**DAVID SHAFER**
          **Plaintiff,**

    **v.**                                  **Case No. 13-C-0929**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social Security Administration**
                    **Defendant.**

---

## DECISION AND ORDER

David Shafer, the plaintiff-claimant in this social security disability case, stands 6'3" tall and weighs over 500 pounds, with a body mass index ("BMI") exceeding 60. See http://www.nhlbi.nih.gov/guidelines/obesity/BMI/bmicalc.htm; see also Tenhove v. Colvin, 927 F. Supp. 2d 557, 574 n.11 (E.D. Wis. 2013) ("A person with a BMI of 30 is considered obese, 40 or greater morbidly obese."). He suffers from degenerative disc disease, which, in combination with his weight makes it difficult for him to stand, walk or sit for extended periods of time. He has sleep apnea, which interferes with the amount of restful sleep he gets, leaving him exhausted the next day. He's also diabetic and hypertensive.

Plaintiff's primary care physician imposed restrictions that would preclude full-time employment. If accepted, this opinion would require a finding of disability. See, e.g., Wiersma v. Astrue, No. 10-C-240, 2010 WL 5095318, at *10 (E.D. Wis. Dec. 8, 2010) (citing Bladow v. Apfel, 205 F.3d 356, 359 (8th Cir. 2000) (explaining that, under SSR 96–8p, ability to work only part-time mandates disability finding)). The doctors selected by the Social Security Administration ("SSA") found plaintiff limited to sedentary work. Under the SSA's Medical-

Vocational Guidelines, a person limited to sedentary work, at plaintiff's age (over fifty) and with his high school level education and semi-skilled work experience, would also qualify as disabled – if he cannot perform his past relevant work. Plaintiff primarily worked as a truck and bus driver, positions now beyond his capacity. However, for a short period of time in 2007 he worked as a telemarketer, a sedentary job. An Administrative Law Judge ("ALJ") concluded that despite its short duration this position qualified as past relevant work. Rejecting plaintiff's testimony and the opinion of his doctor, the ALJ further concluded that plaintiff remained able to perform the telemarketer job. The ALJ therefore found plaintiff not disabled.

Plaintiff now seeks judicial review of the ALJ's decision. For the reasons set forth below, I find that the ALJ erred in his evaluation of the treating source report and the credibility of plaintiff's testimony; he also overlooked vocational evidence suggestive of disability. I further find that the ALJ failed to resolve material factual disputes regarding whether the telemarketer job qualified as past relevant work. I therefore reverse and remand for further proceedings.

## I. ADMINISTRATIVE PROCEEDINGS[1]

Plaintiff applied for benefits in June of 2008, claiming that he became disabled as of November 1, 2006. (Tr. at 319, 326.) The SSA denied the application initially (Tr. at 170-71, 219) but on reconsideration found him disabled as of September 24, 2008 (the day before his fiftieth birthday) under Medical-Vocational Rule 201.14 (Tr. at 172-74; 635-36).[2]

_____

[1]In this decision I present a summary of the administrative record, which includes multiple applications and two hearings before the ALJ (with an Appeals Council remand in between).

[2]Under the Medical-Vocational Guidelines, 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 201.14, a finding of disabled is directed for an individual between the ages of 50 and 54 who has a high school education, no transferable skills, who can no longer perform past relevant work, and who is limited to performing sedentary work.

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), seeking the earlier onset date, but the appeal backfired when the ALJ found that plaintiff was not disabled at any time. Proceeding through the familiar five-step sequential evaluation process, see 20 C.F.R. § 404.1520(b), the ALJ first determined that while plaintiff was not currently employed, he had engaged in "substantial gainful activity" ("SGA") since the alleged onset date. In making this finding, the ALJ relied on a work history form in which plaintiff reported working for two months in 2007 as a telemarketer; earnings records showed that plaintiff made $2020 that year, exceeding the 2007 SGA level of $900 per month. (Tr. at 28, 331, 417-18.)

At step two, the ALJ found that plaintiff suffered from the severe impairments of obesity, degenerative disc disease, sleep apnea, and diabetes, none of which qualified as conclusively disabling at step three under the Listings of impairments. The ALJ then determined that plaintiff retained the residual functional capacity ("RFC") for sedentary work, with no more than occasional stooping, bending, crouching, or climbing of ramps and stairs; no climbing of ropes, ladders, or scaffolds; no crawling or kneeling; and with a sit/stand option so that he would not need to stand for more than ten minutes at a time or sit for more than sixty minutes at a time. (Tr. at 29.) In making this finding, the ALJ discounted plaintiff's testimony and the opinion of plaintiff's primary care physician asserting greater limitations. Instead, the ALJ gave significant weight to the opinions of the SSA consultants that plaintiff could perform sedentary work.[3] (Tr. at 29-34.)

At step four, the ALJ found that plaintiff's two month stint as a telemarketer in 2007 qualified as SGA and past relevant work. Under SSA regulations, an "unsuccessful work

--------

[3]The ALJ added various postural limitations based on plaintiff's hearing testimony. (Tr. at 33.)

attempt" ("UWA") does not qualify as SGA, see Kangail v. Barnhart, 454 F.3d 627, 629 (7th Cir. 2006); see also 20 C.F.R. § 404.1574(c)(3) ("We will consider work of 3 months or less to be an unsuccessful work attempt if you stopped working, or you reduced your work and earnings below the substantial gainful activity earnings level, because of your impairment or because of the removal of special conditions which took into account your impairment and permitted you to work."), but the ALJ found this exception inapplicable because plaintiff testified that he was terminated from the telemarketer job due to absences caused by a respiratory illness unrelated to his severe impairments. The ALJ also determined that two months was long enough to learn to do the job. (Tr. at 34.) Finally, the ALJ determined that plaintiff was capable of performing this past relevant work. Plaintiff testified that he worked at the telemarketer job from February to April 2007, and in a work activities reported he stated that he spent time fielding incoming calls and making outgoing calls for a cable company, as well as assisting with billing. He did not have to lift or carry any weight and spent his workday in a seated position. At plaintiff's hearing, a vocational expert testified that the telemarketer job required sedentary exertion, and that a hypothetical individual with plaintiff's RFC would be capable of performing it. (Tr. at 34.)[4] The ALJ accordingly found plaintiff not disabled and denied the application. (Tr. at 36.)

## II. STANDARD OF REVIEW

The court reviews an ALJ's decision to deny benefits to determine whether it was supported by "substantial evidence" and free of legal error. Farrell v. Astrue, 692 F.3d 767, 770 (7th Cir. 2012). Substantial evidence means "'such relevant evidence as a reasonable mind

---

[4]The ALJ alternatively found that plaintiff's claim failed at step five because he could do other jobs. (Tr. at 35.) The Commissioner concedes that the ALJ erred on this point. (Def.'s Mem. at 17.) I need not discuss it further.

might accept as adequate to support a conclusion.'" <u>Moore v. Colvin</u>, 743 F.3d 1118, 1120-21 (7th Cir. 2014) (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)).  Although the court may not under this deferential standard re-weigh the evidence or substitute its own judgment for that of the ALJ, the court must examine the ALJ's decision to determine whether it reflects a logical bridge from the evidence to the conclusions sufficient to allow a reviewing court to assess the validity of the agency's ultimate findings and afford the claimant meaningful judicial review.  <u>Id.</u> at 1121.  While the ALJ need not discuss every piece of evidence in the record, he may not simply select and discuss only that evidence which favors his ultimate conclusion; rather, an ALJ's decision must be based upon consideration of all the relevant evidence.  <u>Smith v. Apfel</u>, 231 F.3d 433, 438 (7th Cir. 2000).  A decision that skips over important evidence or lacks adequate discussion of the issues will be remanded.  <u>See</u> <u>Villano v. Astrue</u>, 556 F.3d 558, 562 (7th Cir. 2009).

Conclusions of law are not entitled to deference, so if the ALJ commits an error of law reversal is required without regard to the volume of evidence in support of the factual findings. <u>Binion on Behalf of Binion v. Chater</u>, 108 F.3d 780, 782 (7th Cir. 1997).  The ALJ's failure to comply with the Commissioner's regulations and Rulings may constitute legal error requiring remand.  <u>See, e.g.</u>, <u>Tregler v. Barnhart</u>, 414 F. Supp. 2d 862, 868 (N.D. Ill. 2006).

## III.  DISCUSSION

**A.  Treating Source Opinion**

### 1.  Dr. Carlson's Report

In an October 2008 report, plaintiff's primary care physician, Dr. Edward Carlson, opined that plaintiff could sit and stand/walk for less than two hours in an eight hour work day, required

frequent unscheduled breaks during the work day, and would likely miss more than three work days per month due to his impairments. (Tr. at 641-43.) These restrictions, if accepted, would preclude all full-time work. (See Tr. at 197.)

## 2. Applicable Legal Standards

An ALJ must give "controlling weight" to a treating source's opinion if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence. Punzio v. Astrue, 630 F.3d 704, 710 (7th Cir. 2011). If the opinion does not meet the test for controlling weight, the regulations require the ALJ to consider a checklist of factors – the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and supportability of the physician's opinion – to determine what weight to give the opinion. Moss v. Astrue, 555 F.3d 556, 561 (7th Cir. 2009); Bauer v. Astrue, 532 F.3d 606, 608 (7th Cir. 2008). The ALJ must always offer a sound explanation for rejecting a treating source's opinion. Punzio, 630 F.3d at 710.

## 3. Analysis

In the present case, the ALJ gave Dr. Carlson's report "very limited weight" because, the ALJ said, at the time he authored it Dr. Carlson has seen plaintiff just two times. The ALJ further stated that Dr. Carlson's notes after October 2008 (reflecting four more visits) focused on completing paperwork rather than actual treatment and in no way substantiated the limitations. (Tr. at 33.) The ALJ concluded:

> Since Dr. Carlson did no testing, and had no other medical documentation for the claimant's alleged conditions, he apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and uncritically accepted as true most, if not all, of what the claimant reported. Accordingly,

based on the record as a whole, and on Dr. Carlson's records specifically, I find that the opinion of Dr. Carlson is inconsistent with the record, unsupported, and entitled to little weight.

(Tr. at 34.)

Even if I assume, arguendo, that the report does not meet the test for controlling weight based on the absence of testing or other clinical findings in Dr. Carlson's records,[5] the three reasons provided by the ALJ for affording the report only limited weight cannot withstand scrutiny, necessitating remand.

### a. Length of Treatment Relationship

First, the ALJ erred in evaluating the length and extent of plaintiff's treatment relationship with Dr. Carlson. Contrary to the ALJ's suggestion of just two visits prior to October 2008 (one in 2006 and the other in 2008),[6] the medical records show that Dr. Carlson acted as plaintiff's treating physician since 2003.[7] (Tr. at 691-93.) Indeed, at the hearing plaintiff told the ALJ that Dr. Carlson had been his physician since 2003, and that Dr. Carlson would know him better than any other. (Tr. at 150.) The medical records confirm Dr. Carlson's long experience with plaintiff.

---

[5]Plaintiff notes that Dr. Carlson sent him out for testing and received the reports. However, in support he refers to a 2003 nephrology consult and renal ultrasound test. (Tr. at 691-93.) It is not clear how this evidence supports Dr. Carlson's 2008 restrictions.

[6]In his decision, the ALJ cited a January 2006 progress note from Dr. Carlson (Tr. at 31, citing Ex. 7F/7 [Tr. at 608]) and a January [sic] 2008 progress note from Dr. Carlson (Tr. at 31, citing Ex. 8F/1 [Tr. at 609]). As the Commissioner notes, the ALJ incorrectly listed the month of the latter note; it was actually July 2008. (Tr. at 609.)

[7]At that time, Dr. Carlson referred plaintiff for a nephrology consult due to proteinuria, a condition in which the patient's urine contains an abnormal amount of protein. Proteinuria is a sign of chronic kidney disease, which can result from diabetes or high blood pressure. See http://kidney.niddk.nih.gov/kudiseases/pubs/proteinuria/.

During an April 2004 consultative exam, plaintiff reported taking Cozaar, a blood pressure medication, prescribed by Dr. Carlson. (Tr. at 590.) On January 24, 2006, plaintiff saw Dr. Carlson to check his blood pressure and fill out a form to obtain Cozaar for free through the pharmaceutical company's patient assistance program. Dr. Carlson noted that plaintiff had been forced to give up his job as a long-distance truck driver due to severe degenerative disc disease. (Tr. at 608.) On March 15, 2007, plaintiff saw Dr. Carlson complaining of respiratory symptoms, cough, phlegm, headache, and fatigue. Dr. Carlson assessed upper respiratory infection/sinusitis, providing Levaquin and noting that plaintiff's finance's were tight; he was working for a "phone survey group" but residing in a homeless shelter. (Tr. at 607.)

On July 11, 2008, plaintiff returned to Dr. Carlson to fill out the waiver to get Cozaar for his hypertension. Dr. Carlson noted that plaintiff suffered from chronic back pain due to morbid obesity, and on exam Dr. Carlson found plaintiff morbidly obese, weighing over 400 pounds. Plaintiff had constant low back pain with some radiation to the leg, as well as knee discomfort, and requested a muscle relaxant to help him fall asleep at night. Dr. Carlson assessed hypertension, under reasonably good control; chronic low back pain; and morbid obesity. Dr. Carlson further noted that "in the patient's condition it is difficult for the patient to do any kind of work and social security disability would be a reasonable consideration if he would be willing to reapply." (Tr. at 609.) Dr. Carlson filled out the paperwork for Cozaar and provided free samples of Skelaxin to see if this helped with plaintiff's discomfort at night. Dr. Carlson also completed a verification of disability form for the Walworth County Housing Authority. (Tr. at

8

433, 609.)[8] Plaintiff was at the time living in a homeless shelter but would have a chance with a voucher to obtain an apartment. Dr. Carlson also provided the name of an attorney to assist in obtaining social security. (Tr. at 609.)

The Commissioner concedes that the ALJ failed to appreciate the vintage of plaintiff's treatment relationship with Dr. Carlson but argues that the ALJ properly focused on the period between the alleged onset date (November 2006) and the opinion (October 2008). However, the ALJ did not say that he was focusing on that time period, and in reviewing an ALJ's decision I am limited to the reasons he provided. See, e.g., Roddy v. Astrue, 705 F.3d 631, 637 (7th Cir. 2013). In any event, the regulations do not say that in evaluating the length, nature, and extent of a treatment relationship the ALJ should ignore pre-onset visits. The reason why treating source opinions occupy such a prominent position in social security cases is because these opinions may "provide a detailed, longitudinal picture" of the claimant's conditions. 20 C.F.R. § 404.1527(c)(2). Obviously, that longitudinal picture may include pre-onset contacts. Finally, even if an ALJ could properly cabin his analysis to post-onset records, the ALJ did not do that in the present case. The ALJ specifically discussed a January 2006 progress note (before the alleged onset) and a July 2008 progress note[9] (Tr. at 31, citing Tr. at 608, 609; Tr. at 33, referencing these two notes in discounting Dr. Carlson's opinion); he did not discuss the post-onset March 15, 2007 record (Tr. at 607).

_____

[8]This check-mark report gave the completing physician three choices in defining the applicant's disability, and Dr. Carlson selected: "Has a physical, mental or emotional handicap which is expected to be long and indefinite in duration; substantially impedes his/her ability to live independently; and is of such a nature that the person's ability to live independently could be improved by more suitable housing." (Tr. at 434.) Dr. Carlson did not check the blank for "a disability as defined in Section 223 of the Social Security Act." (Tr. at 434.)

[9]As indicated in note 6, supra, the ALJ incorrectly said this note was from January 2008.

9

### b.    Later Treatment Records

The ALJ's second reason for discounting Dr. Carlson's report was that the later visits focused on completing paperwork rather than actual treatment. However, the ALJ never explained why it was suspect for Dr. Carlson to assist plaintiff in filling out forms. See McClinton v. Astrue, No. 09 C 4814, 2012 WL 401030, at *12 (N.D. Ill. Feb. 6, 2012) ("The ALJ simply fails to explain how the completion of necessary paperwork for a patient, however frequent, mitigates the credibility or accuracy of a treating doctor's medical opinion.").

Moreover, the later records offer further explanation and support for Dr. Carlson's opinion.  Pharmacy records indicate that on October 2, 2008, Dr. Carlson prescribed Cyclobenzaprine and Tramadol.  (Tr. at 645.)[10]   On November 3, 2008, Dr. Carlson prepared a medical restriction note indicating that plaintiff was to avoid bending, stooping, or lifting greater than ten pounds.  He also could not sit or stand for too long, ten to fifteen minutes maximum.  (Tr. at 630.) On November 26, 2008, Dr. Carlson prepared a letter further clarifying plaintiff's physical restrictions.  Dr. Carlson noted that plaintiff was morbidly obese, weighing 480 pounds, and suffered from degenerative lumbar disc disease and osteoarthritis of both knees.  He also suffered from an old shoulder injury with lingering discomfort.  Other medical problems included obstructive sleep apnea, hypertension, and increased protein in the urine. Dr. Carlson concluded: "In light of the above conditions the patient is extremely limited in

---

[10]Cyclobenzaprine is used to relax muscles and relieve pain and discomfort, see http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682514.html., and Tramadol is prescribed to treat moderate to moderately severe pain, see http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695011.html.  Pharmacy records from 2010 showed that Dr. Carlson prescribed Metformin for diabetes, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a696005.htm, and Losartan for high blood pressure, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695008.html.  (Tr. at 646-47.)

employment options."  (Tr. at 631.)

On November 30, 2009, plaintiff returned to Dr. Carlson to fill out a form to obtain free medication.  Dr. Carlson noted that plaintiff suffered from a number of medical problems including morbid obesity, obstructive sleep apnea, hypertension, and significant proteinuria. He had been on Cozaar through the assistance program of the pharmaceutical company and needed paperwork filled out.  On exam, he weighed 485 pounds.  He was concerned about diabetes and a possible thyroid condition.  Due to lack of insurance, he had not had any blood work for several years.  In light of his proteinuria, Dr. Carlson wanted to see his blood pressure better.  He also needed to be on an andregenic receptor binder to protect the kidneys against arthropathy.  Dr. Carlson increased the Cozaar dose, providing samples.  He also ordered tests for thyroid concerns and diabetes.  (Tr. at 652.)

On February 5, 2010, plaintiff saw Dr. Carlson for follow up of his hypertension and diabetes.  He had been started on Metformin for diabetes and was also on Cozaar for blood pressure and to protect his kidneys.  He had a history of proteinuria and had seen a nephrologist.  He had not been able to lose weight.  He had a problem with chronic back pain due to degenerative disc disease and had not been able to work.  Dr. Carlson assessed morbid obesity, adult-onset diabetes, and hypertension under good control.  He was to see diabetic educators and monitor his blood sugar.  (Tr. at 649.)

On June 17, 2011, plaintiff saw Dr. Carlson because of suspected bronchitis, complaining of a cough for a week.  At that time, he was not taking Metformin or Cozaar because he could not afford them.  His blood pressure was 150/80 on the right and 160/80 on the left.  Dr. Carlson noted that they needed to treat the hypertension, as well as the cough and bronchitis.  He provided a voucher for an antibiotic.  He also provided samples of Benicar, a

11

blood pressure medication.[11]  Dr. Carlson found that plaintiff also needed a diuretic, noting peripheral edema bilaterally.  Dr. Carlson advised that Metformin is on the $4 list at Wal-Mart, but plaintiff did "not have enough money to even buy the medication."  (Tr. at 703.)

On May 18, 2012, Dr. Carlson wrote a letter indicating that non-steroidal anti-inflammatory medications can be detrimental to the kidneys.  Diabetics and patients with renal diseases must totally avoid this category of medication.  (Tr. at 706.)

While the ALJ discussed Dr. Carlson's later records in the body of his decision, in analyzing Dr. Carlson's opinion he failed to appreciate the treatment Dr. Carlson provided.  He also failed to consider the further explanation for Dr. Carlson's opinion contained in the records.

### c.    Reliance on Subjective Complaints

Third, the ALJ stated that Dr. Carlson "apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and uncritically accepted as true most, if not all, of what the claimant reported."  (Tr. at 34.)  This boilerplate frequently appears in ALJ decisions,[12] but it tells the court nothing about the specifics of the case.  See Mayberry

---

[11]http://www.drugs.com/benicar.html.

[12]See, e.g., Scroggins v. Colvin, No. 10 CV 50320, 2013 WL 4048103, at *9 (N.D. Ill. Aug. 9, 2013) ("Third, the ALJ asserted that Fried 'apparently relied quite heavily on the subjective report of symptoms and limitations provided by' the Claimant."); Endsley v. Astrue, No. 1:12-cv-333, 2013 WL 869748, at *7 (S.D. Ind. Mar. 7, 2013) ("The ALJ rejected Dr. Anderson's figures on the ground that her opinion was not supported by her own medical records and she therefore 'apparently relied quite heavily on the subjective report of symptoms and limitations provided by [Endsley].'"); Butler v. Astrue, No. 11-cv-07975, 2013 WL 660020, at *10 (N.D. Ill. Feb. 22, 2013) ("The ALJ gave little weight to Ms. Butler's treating source doctor's opinion . . . because, 'the doctor, who treated the claimant for the first time on that day and has no history with her, apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported.'"); Carnaghi v. Astrue, 886 F. Supp. 2d 861, 870 (N.D. Ill. 2012) ("The ALJ noted that Dr. Garapati 'apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant.'"); Reeder v. Astrue,

v. Astrue, 461 Fed. Appx. 705, 709 n.1 (10th Cir. 2012) (stating that this reason for rejecting a treating source opinion "is conclusory and relies on improper boilerplate language"); Schieffer v. Astrue, No. 11-CV-99, 2012 WL 1582032, at *6-7 (N.D. Okla. May 4, 2012) (rejecting reliance on this improper boilerplate language); Bollmeyer v. Astrue, No. 10-3266, 2011 WL 1769790, at *9 (W.D. Mo. May 9, 2011) (holding that "the ALJ must do more than combine boilerplate language with a citation to the medical source statements"). The ALJ must explain what in the record makes such a conclusion "apparent." McClinton, 2012 WL 401030, at *11. While it is permissible for an ALJ to reject a report "based solely on the patient's subjective complaints," Ketelboeter v. Astrue, 550 F.3d 620, 625 (7th Cir. 2008), because almost all diagnoses require some consideration of the patient's statements the ALJ should specify why he believes the weight the treating source accorded the claimant's statements was out of the ordinary, unnecessary, or otherwise unreliable, McClinton, 2012 WL 401030, at *11. The ALJ failed to do that here. Further, as discussed above, Dr. Carlson conducted several examinations of plaintiff; it is thus not "apparent" that Dr. Carlson merely parroted plaintiff's subjective complaints. The record also contains objective findings from other sources, including x-rays showing degenerative changes to the lumbar spine (Tr. at 593, 596, 615, 690), reduced ranged of motion and positive straight leg raising (Tr. at 612), and morbid obesity (Tr. at 613).

---

No. 1:11-CV-00141, 2012 WL 928738, at *12 (N.D. Ind. Mar. 19, 2012) ("In his opinion, however, the ALJ used this changed diagnosis as an example of how Dr. Lane apparently relied quite heavily on Reeder's subjective report of her symptoms and limitations and seemed to uncritically accept as true most, if not all, of what Reeder reported."); McClinton, 2012 WL 401030, at *11 ("Still, [the ALJ] claimed that Dr. Hatter-Stewart 'apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported.'").

**B.      Credibility**

     **1.      Plaintiff's Testimony**

          **a.      The First Hearing**

At his initial hearing before the ALJ on July 7, 2010, plaintiff testified that he was fifty-one years old, 6'3-½" tall, and 500 pounds.  He had completed high school and lived alone in a studio apartment.  (Tr. at 112.)  He indicated that he last worked as telemarketer for about two months, ending in April 2007.[13]  (Tr. at 113.)  He reported other past work as a part-time bus driver, truck driver, and bartender.  (Tr. at 113-16.)

Plaintiff testified that he could no longer work full-time after November 2006 due to back pain.  (Tr. at 117.)  He indicated that he could sit for no more than ½ hour, lift no more than ten pounds, stand for no more than ten or fifteen minutes, and walk no more than 300 yards without increased pain.  (Tr. at 118.)  He testified that because of his weight he experienced shortness of breath, and difficulty bending and moving.  He almost always sat to use the toilet because standing in one place made his back hurt more. (Tr. at 119.)  He indicated that the pain interfered with sleep to the point that he sometimes didn't sleep for days until he "basically pass[ed] out from exhaustion."  (Tr. at 120.)  He explained that the lack of sleep affected his

---

[13]On further questioning by the ALJ, plaintiff testified that he did the telemarketer job from February into April 2007, about two months.  (Tr. at 127.)  The job ended when plaintiff was terminated for missing too much time during the probationary period.  Plaintiff stated that he missed time due to a series of colds, the flu, and bronchitis.  (Tr. at 128.)  He took time off at his doctor's suggestion and was terminated for missing too much work.  He testified that this was a full-time job.  He denied that he could perform that work now because his pain had gotten worse; he needed to shift positions more often, and the employer would not accept his having to lay down due to pain.  (Tr. at 129.)  He testified that he needed to lay down two to three times per day.  (Tr. at 130.)

concentration and cost him a previous job. He used a "CPAP machine" for his sleep apnea.[14] (Tr. at 120.)

Plaintiff testified that on a typical day he read, listened to the radio, watched TV, and played video games. He attended church weekly. (Tr. at 121.) He indicated that he had good and bad days. On a bad day, he did not leave bed except to eat and use the bathroom. (Tr. at 121-22.) He did not store things in lower drawers to avoid bending and purchased a grabber to pick things up off the floor. (Tr. at 122.) He was able to clean his small apartment, basically one room. Due to his diabetes, he lost teeth, which required him to eat softer foods, and experienced blisters on his lower legs. (Tr. at 123.)

### b.    The Second Hearing

Following an Appeals Council remand, plaintiff appeared for a second hearing before the ALJ on June 5, 2012. Plaintiff testified that his weight had been increasing over the past several years, now 508 pounds. (Tr. at 137.) He indicated that he graduated from high school, with additional training at diesel truck driver school. He was last employed by the Carlton Group, where he worked for about two months as a telemarketer. (Tr. at 138, 139-40.) He indicated that this was a full-time job, but he missed at least five days due to illness during the six to eight weeks he worked there. (Tr at 140.) He testified that he was terminated from the job for missing too many days due to illnesses – upper respiratory disease, colds, flu, and

---

[14]A CPAP ("continuous positive airway pressure therapy") machine helps a person who has obstructive sleep apnea breathe more easily during sleep. The machine increases air pressure in the throat so that the airway does not collapse when the person breathes in. See http://www.webmd.com/sleep-disorders/sleep-apnea/continuous-positive-airway-pressure-cpap-for-obstructive-sleep-apnea.

pneumonia – back to back and overlapping.[15]  (Tr. at 141.)  Plaintiff stated that he had trouble sitting as required for this job, but his head-set allowed him to stand and shift positions frequently.  He believed he made $8.50/hour but wasn't sure.  (Tr. at 141.)

Plaintiff testified that he could no longer work full-time due to severe pain and mobility issues.  He indicated that he experienced pain in his low back, knees, and left shoulder, and numbness in his fingers.  (Tr. at 145.)  He complained of problems walking, crouching, stooping and bending, lifting and moving things. (Tr. at 146.)  He testified that he could sit for about an hour before he had to shift positions, usually laying down.  He indicated that he lied down six or seven times per day, for at least fifteen minutes to an hour.  He stated that he could walk about 100 yards before experiencing pain and shortness of breath.  He could lift ten pounds. (Tr. at 147.)  He indicated that he had trouble getting in and out of chairs, especially if they were low to the ground or had no arms to use to help himself up.  He also had trouble picking things up off the floor.  (Tr. at 148.)  He used an electric cart at the store.  (Tr. at 149.)  He did not see any doctors or take any medications because he had no money or insurance; his CPAP machine was broken.  (Tr. at 149-50.)

On a typical day, plaintiff woke up, tried to stretch his legs and back, made breakfast, then usually went back to bed.  (Tr. at 150-51.)  When possible, he would sit outside for twenty to thirty minutes to get some fresh air, then go back inside and watch TV, read, or play video games.  As needed, he would lie down when his back started hurting.  He was able to drive but needed a break after forty or fifty miles because of his back.  (Tr. at 151.)  He socialized at his church, and read, watched DVDs, and played video games as hobbies.  (Tr. at 152.)  He

---

[15]Plaintiff testified that he recovered from this series of respiratory conditions before he was terminated.  (Tr. at 154.)

16

denied outside chores, e.g., mowing the lawn, shoveling snow. (Tr. at 152-53.) After two flights of stairs he was "pretty much done for the day." (Tr. at 153.) He was able to clean his small, one room apartment, so long as he did not try to do everything all at once. (Tr. at 154.)

## 2. Applicable Legal Standards

Social security regulations set forth a two-step process for evaluating symptoms, such as pain, fatigue, shortness of breath, or weakness. SSR 96-7p, 1996 WL 374186, at *2. First, the ALJ must determine whether the claimant suffers from an underlying medically determinable impairment that could reasonably be expected to produce the claimant's pain or other symptoms. If not, the symptoms cannot be found to affect the claimant's ability to do basic work activities. Id.

Second, if an underlying impairment that could reasonably be expected to produce the symptoms has been shown, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit his ability to do basic work activities. Id. If the symptoms alleged are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the claimant's statements based on the entire case record. Id. The ALJ may not discount the claimant's credibility just because his claims lack support in the objective medical evidence. Pierce v. Colvin, 739 F.3d 1046, 1049-50 (7th Cir. 2014). In evaluating credibility in light of the entire record, the ALJ should consider (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures

other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. SSR 96-7p, 1996 WL 374186, at *3.

An ALJ's credibility determination is entitled to deference, and the court will overturn it only if it is "patently wrong." Bates v. Colvin, 736 F.3d 1093, 1098 (7th Cir. 2013). However, the ALJ must comply with SSR 96-7p when evaluating credibility. Giles ex rel. Giles v. Astrue, 483 F.3d 483, 488 (7th Cir. 2007); Prochaska v. Barnhart, 454 F.3d 731, 738 (7th Cir. 2006). Further, when a credibility finding rests on objective factors or fundamental implausibilities, rather than on a claimant's demeanor or other subjective factors, the court has greater leeway to evaluate the ALJ's determination. Bates, 736 F.3d at 1098.

### 3.    Analysis

In the present case, the ALJ started his credibility assessment with the usual boilerplate:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(Tr. at 31.) This is meaningless, as it fails to specify which statements are not credible, Pierce, 739 F.3d at 1050, and backwardly implies that ability to work is determined first and is then used to gauge the claimant's credibility, Bjornson v. Astrue, 671 F.3d 640, 645 (7th Cir. 2012). However, an ALJ's error in using this "template" will be deemed harmless if he goes on to provide specific reasons for his credibility determination. See, e.g., Pepper v. Colvin, 712 F.3d 351, 367-68 (7th Cir. 2013); Filus v. Astrue, 694 F.3d 863, 868 (7th Cir. 2012).

In the present case, the ALJ later stated:

> Several factors were considered to assess credibility. First, the claimant's course

18

of medical treatment does not reflect debilitating impairments that preclude him from working. The claimant has only taken over-the-counter medications for his back pain. The claimant testified at the hearing that he was not taking any medication currently, because he could not afford them. This is despite the history of receiving some of his medications for free through Dr. Carlton [sic]. This hardly reflects major impairments.

The claimant's ability to perform activities of daily living also belies complaints of debilitating impairments that preclude him from working. In function reports the claimant consistently reported the ability to care for his personal hygiene, cook, clean, shop, and drive. He reported spending time reading, watching DVDs, studying, and attending church.

In summary, the evidence of record in this case does not support a finding that the claimant is unable to perform work activities. The evidence of treatment is sparse at best and the evidence that the claimant is able to perform a wide range of activities of daily living indicates that the claimant's impairments are not debilitating. There is simply not enough evidence in the record to conclude that the claimant's impairments limit him beyond the restrictions set forth in the above residual functional capacity assessment.

(Tr. at 33.)

The ALJ essentially gave two reasons for discounting plaintiff's testimony – his limited treatment and his daily activities. Neither are sufficient under Seventh Circuit case-law.

### a.    Sparse Treatment

First, an ALJ cannot "rely on an uninsured claimant's sparse treatment history to show that a condition was not serious without exploring why the treatment history was thin."[16] Pierce, 739 F.3d at 1050. Plaintiff at times received free blood pressure pills through Dr. Carlson and

---

[16]The Commissioner notes that the claimant "must do something more than merely plead poverty at the hearing." Wiggins v. Apfel, 29 F. Supp. 2d 486, 494 (N.D. Ill. 1998). The record in this case contains clear evidence of poverty, in addition to plaintiff's testimony, including Dr. Carlson's records noting inability to afford medications (Tr. at 703), DVR records noting that his uninsured status allowed very limited access to medical care (Tr. at 471), plaintiff's participation in a pharmaceutical company's charitable  program (Tr. at 608), his residence in a homeless shelter (Tr. at 607), and his application for assistance from the Walworth County Housing Authority (Tr. at 433-34).

the pharmaceutical company's charitable program, but the ALJ cited no evidence that plaintiff was eligible for free <u>pain</u> medications or other treatment for his back.[17]  Moreover, Dr. Carlson specifically noted that non-steroidal anti-inflammatory medications can be detrimental to the kidneys, and that diabetics and patients with renal diseases must totally avoid this category of medication.  (Tr. at 706.)  Dr. Carlson had long been concerned about plaintiff's kidneys (Tr. at 631, 638, 649, 652, 691-93), evidence the ALJ overlooked.  The ALJ may not discount a claimant's credibility based on his failure to seek treatment disapproved by his doctor.  <u>See</u> <u>Ribaudo v. Barnhart</u>, 458 F.3d 580, 585 (7th Cir. 2006) (citing <u>Shramek v. Apfel</u>, 226 F.3d 809, 813 (7th Cir. 2000)).[18]  The ALJ failed to identify what other treatment plaintiff should have been receiving.  <u>See</u> <u>Brown v. Barnhart</u>, 298 F. Supp. 2d 773, 797 (E.D. Wis. 2004) (reversing where "the ALJ failed to cite any medical evidence concerning what sort of treatment plaintiff should have been pursuing"); <u>Dominguese v. Massanari</u>, 172 F. Supp. 2d 1087, 1096 (E.D. Wis. 2001) (stating that, in the absence of medical evidence concerning how regularly a patient with the plaintiff's condition would be expected to see a doctor, the ALJ should not have made his own

---

[17]Dr. Carlson provided muscle relaxers in 2008 (Tr. at 609, 645), but there is no indication in the record that plaintiff was able to obtain free pain medication from Dr. Carlson on an ongoing basis.  On June 17, 2011, Dr. Carlson provided a voucher for an antibiotic to treat plaintiff's bronchitis.  Dr. Carlson noted that plaintiff was not at that time taking Metformin for diabetes or Cozaar for hypertension because he could not afford them.  Dr. Carlson provided samples of Benicar, a blood pressure medication.  Dr. Carlson told plaintiff that Metformin is on the $4 list at Wal-Mart, but plaintiff responded that "he does not have enough money to even buy the medication."  (Tr. at 703.)

[18]The Commissioner cites SSR 82-59, which states that a claimant disabled by an impairment amenable to treatment that could be expected to restore his ability to work must follow the prescribed treatment in order to be found disabled, unless there is a justifiable cause for the failure to follow such treatment.  The Ruling requires exploration of all possible resources (e.g., clinics, charitable and public assistance agencies, etc.).  In the present case, the ALJ did not find plaintiff disabled due to an impairment plaintiff failed to treat; rather, the ALJ found that plaintiff's limited treatment diminished his credibility.

independent medical determination about the frequency of doctor visits).

### b.    Daily Activities

Second, the ALJ relied on a list of plaintiff's daily activities without explaining how they undercut of his claims of disabling pain or otherwise showed that he was exaggerating his physical limitations.  The Seventh Circuit has "repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time."  Roddy, 705 F.3d at 639.  In his hearing testimony and written reports, plaintiff alleged significant limitations in all of the activities the ALJ mentioned.  Regarding personal care, he reported difficulty dressing, using the toilet, showering, and shaving.  (Tr. at 119, 436, 513, 547, 557.)  Regarding cooking, he indicated that he made only simple meals.  (Tr. at 437, 514, 547, 558.)  He cleaned in short spurts to avoid pain.  (Tr. at 154, 547, 558.)  He used an electric cart to get around the store when shopping.  (Tr. at 149, 512, 547, 562.)  He remained able to drive a car (Tr. at 119, 559) but needed a break after forty or fifty miles because of his back (Tr. at 151).  The ALJ mentioned that plaintiff spent time reading, watching TV, and attending church, but he never explained how those minimal hobbies undercut plaintiff's credibility, see Mason v. Barnhart, 325 F. Supp. 2d 885, 903-04 (E.D. Wis. 2004); Dominguese, 172 F. Supp. 2d at 1098, and plaintiff testified that he punctuated periods of sitting to read, watch TV, or play video games with periods of lying down to rest his back.  (Tr. at 150.)

The Commissioner notes that while an ALJ cannot rely on daily activities as de facto proof that the claimant is able to work outside the home, the ALJ may point to such activities as evidence that the claimant exaggerated his physical limitations.  See, e.g., Lewis v. Commissioner of Social Sec., No. 2:12-cv-241, 2013 WL 4670202, at *7 (N.D. Ind. Aug. 30,

2013).  In <u>Lewis</u>, however, the ALJ specifically explained why the plaintiff's activities undercut her claim that she could stand or sit for just minutes at a time.  <u>Id.</u>  In the present case, the ALJ simply provided a list of activities, without linking them to any of plaintiff's claimed restrictions (and without considering plaintiff's claimed limitations in performing those activities).  <u>See</u> <u>Brown v. Colvin</u>, No. 13-C-262, 2013 WL 5539427, at *8 (E.D. Wis. Oct. 7, 2013) ("[The ALJ must explain <u>why</u> particular activities undercut the claimant's credibility; it is not enough to simply list various chores, declare them 'significant,' and then find the claimant incredible.").  Given these flaws, the case must be remanded for reconsideration of plaintiff's credibility.

## C.    Vocational Evidence

The case must also be remanded for consideration of important vocational evidence. In November of 2008, plaintiff sought services from the state Division of Vocational Rehabilitation ("DVR").  (Tr. at 472-80.)  However, on February 5, 2009, the DVR closed his file because he was "not medically ready for work at this time."  (Tr. at 461.)

In her report, the DVR counselor noted that plaintiff had difficulty navigating through the crowded resource room and was completely out of breath from the thirty yard walk to her office. She provided plaintiff with water and a larger, armless chair, as he could not fit into a standard office chair.  Plaintiff's recent work history consisted primarily of driving, but he was no longer eligible for a CDL per Dr. Carlson due to sleep apnea.  Plaintiff also had orthopedic concerns that restricted sitting and standing more than ten to fifteen minutes, which would impact all occupations.    Plaintiff  explained  that  he  briefly  worked  as  a  phone  service  center representative, thinking the sedentary nature of the job suited him.  He did have the option to change positions but found the inability to take breaks (prone) between positions made for a very long day and pain levels increased significantly, affecting his ability to focus on customer

22

service.  He was terminated for excessive absenteeism related to respiratory infections, which he contracted several times per year, while still on probation.  He also reported a work history tending bar, but his bending, stooping, and lifting restrictions, combined with the need to accommodate positioning concerns, would likely preclude returning to that line of work.  In reviewing other vocational options, "it became apparent that [plaintiff's] excessive absenteeism would preclude most, if not all occupations.  Absenteeism occurs for a variety of reasons (poor sleep/fatigue, hypertension associated symptoms, respiratory concerns) with the most troubling being the unpredictable back spasms that seem to occur for 'no reason'." (Tr. at 462.)  Plaintiff reported being "laid out for three days" after trying to bend to put on his sock.  (Tr. at 462.) They discussed security work, such as watching security monitors in a specialized chair that would allow a more pone position, with the option to stand and walk about the monitor room, but no such jobs had been posted for a year or longer, and plaintiff had not been trained in the observation skills for that type of higher level security work.  He was also concerned that pain would impair his concentration for more technical training.  After reviewing his circumstances, the need for a more concerted medical care effort (he was uninsured, causing very limited access) was needed; it was agreed that he would consider reapplying for DVR services after he resolved his medical issues.  (Tr. at 471.)

The ALJ failed to consider these records.  While an ALJ need not mention every piece of evidence in the record, he cannot ignore a line of evidence contrary to his conclusion. Thomas v. Colvin, 745 F.3d 802, 806 (7th Cir. 2014).  The Commissioner waived response to plaintiff's claim of error in this regard, and given the significance of the vocational evidence, I cannot conclude that the ALJ's failure was harmless.  The matter must be remanded for consideration of the DVR evidence.

**D.     Past Relevant Work**

At step four of the sequential evaluation process the ALJ concluded that plaintiff's telemarketer job qualified as past relevant work, and that plaintiff could still do it. For the reasons discussed above, the ALJ must on remand reconsider the latter conclusion. Even if he can do it, it is unclear whether the telemarketer job qualifies as past relevant work.

"Past relevant work" is work that (1) the claimant has done within the past fifteen years, (2) was substantial gainful activity ("SGA"), and (3) lasted long enough for the claimant to learn to do it. 20 C.F.R. § 404.1560(b)(1); see also SSR 82-62, 1982 WL 31386, at *2 (discussing the requirements of recency, SGA, and duration). There is no dispute that plaintiff performed the telemarketer job within the fifteen year period, but he contests the other two factors, which I address in turn.

**1.     SGA**

**a.     Applicable Legal Standards**

**i.     Earnings**

SGA is work activity that involves doing significant physical or mental activities, for pay or profit. 20 C.F.R. § 404.1572. The regulations set forth earnings levels ordinarily indicative of SGA. See 20 C.F.R. § 404.1574. As is pertinent here, the presumptive SGA level for 2007 was $900 per month. See Packham v. Astrue, 762 F. Supp. 2d 1094, 1101 (N.D. Ill. 2011).

**ii.     UWA**

A job deemed to be an "unsuccessful work attempt" ("UWA") does not constitute SGA. See SSR 05-02, 2005 WL 6491604, at *1. "The UWA concept was designed to provide . . . an equitable means, in making SGA determinations, to disregard relatively brief work attempts

24

that do not demonstrate sustained SGA." Id. As is pertinent here, in order to be an UWA the "work must have ended or have been reduced to the non-SGA level within 3 months due to [the claimant's] impairment or to the removal of special conditions related to [his] impairment . . . that are essential to [his] further performance of work. Id. at *2.[19] In making this determination, the SSA does not rely solely on information from the claimant but rather will ordinarily seek confirmation from the employer. Id. at *3. If information from the employer is inconclusive or unavailable, the SSA may seek confirmation of the reason why the claimant discontinued or reduced work from a physician or other medical source. Id. Relevant questions include: when and why the SGA-level work was interrupted, reduced, or stopped; whether there were frequent absences from work; and whether the claimant's job performance was unsatisfactory because of the impairment. Id. at *4.

### b. Analysis

### i. SGA Based on Earnings

It is undisputed that plaintiff earned $2020 in 2007, and that the telemarketer position was the only job he held that year. However, the record contains conflicting evidence regarding how long he worked the job. In a work activity report filed with his June 2008 application, plaintiff wrote that he worked from January 20, 2007 to April 20, 2007, and that he stopped due to his medical condition. (Tr. at 405.) However, in a July 2008 work history report he indicated that he worked from February 2007 to April 2007. (Tr. at 417.) He said the same in two other reports. (Tr. at 447, 522.) At the first hearing before the ALJ, plaintiff testified that he worked from February into April 2007, about two months. (Tr. at 127.) At the second hearing, he

---

[19]Further conditions apply when the work lasted three to six months; work effort of over six months cannot be an UWA. Id. at *3.

initially testified that he did this job for approximately two months (Tr. at 138) but later said: "I'm not sure exactly how many weeks I worked there." (Tr. at 140.) Records obtained from the employer suggest that plaintiff worked from January 29, 2007 to March 21, 2007. (Tr. at 482-83.)[20]

In making his SGA earnings finding, the ALJ relied on the July 2008 work history form indicating that plaintiff worked for two months. (Tr. at 28, citing Ex. 4E/5.) Plaintiff faults the ALJ for failing to discuss the other evidence, particularly the June 2008 report suggesting three months of work, which would average out to $673/month, below the SGA level. Plaintiff also attempts to cast doubt on the ALJ's monthly earnings estimate, noting that if he had worked for two full months he would have made $2560 (8 weeks x 40 hours x $8.00/hour),[21] not the $2020 reported by the SSA. Finally, plaintiff notes that the SSA employees who considered the issue before the ALJ concluded that the telemarketer job was not SGA. (Tr. at 411, 635-36.)

The Commissioner responds that remand to consider the evidence the ALJ skipped would be pointless because we can predict with great confidence that the result would be the same. Schomas v. Colvin, 732 F.3d 702, 707 (7th Cir. 2013) ("[W]e will not remand a case to the ALJ for further explanation if we can predict with great confidence that the result on remand would be the same."). The Commissioner notes that plaintiff's hearing testimony and all but

---

[20]Specifically, the records indicate that plaintiff completed training from 1/29/07 to 2/2/07 and 2/5/07 to 2/9/07, then started his regular schedule on 2/12/07. (Tr. at 482.) He missed work on 2/14, 3/13, 3/14, 3/15, and 3/16, and was terminated on 3/21/07 for too many absences during his probationary period. (Tr. at 483.)

[21]In his work history report, plaintiff wrote that he made $8.00/hour at this job. (Tr. at 418.) At the second hearing, he testified that he believed he made $8.50/hour but wasn't sure. (Tr. at 141.)

one of the work history reports plaintiff completed support a finding of two months, rather than three; the Commissioner also notes that, relying on the employer's records, plaintiff's 2007 income would be $2112, very close to the reported $2020.[22] Finally, the Commissioner notes that the previous determinations by SSA employees were not binding on the ALJ, who engaged in a de novo review.

While the Commissioner's brief marshals evidence that could support a finding that plaintiff's earnings from the telemarketer job reached the SGA level, it is the job of the ALJ, not the court, to weigh the evidence, resolve conflicts, and make independent findings of fact. Powers v. Apfel, 207 F.3d 431, 434 (7th Cir. 2000); see also Spiva v. Astrue, 628 F.3d 346, 353 (7th Cir. 2010) (holding that the harmless error doctrine does not apply simply because the Commissioner finds enough evidence in the record to establish that the ALJ might have reached the same result had he considered all the evidence and evaluated it as the government's brief does). The issue of whether the telemarketer job qualifies as past relevant work is crucial in this case; if it is not, plaintiff qualifies for benefits as of his fiftieth birthday even under the ALJ's RFC.[23] The ALJ must confront all of the evidence and resolve the conflicts, rather than relying on one report that supports his conclusion.

### ii. UWA

The ALJ found that plaintiff's telemarketer job was not an UWA because it ended due

---

[22]The employer's records suggest that plaintiff worked the week of 1/29/07 (40 hours x $8.00/hour=$320); 2/5/07 (40x8.00=320); 2/12/07, missing one day (32x8.00=256); 2/19/07 (40x8.00=320); 2/26/07 (40x8.00=320); 3/5/07 (40x8.00=320); 3/12/07, missing four days (8x8.00=64); and 3/19/07-3/21/07 (24x8.00=192). This would total $2112. The Commissioner speculates that the difference to the reported income of $2020 may be attributable to times when plaintiff was late or a shortened workday on the day he was fired.

[23]As indicated above, the Commissioner concedes that the ALJ erred at step five.

to absences caused by a respiratory condition; it did not end due to plaintiff's severe impairments, nor was it reduced to non-SGA levels within three months due to plaintiff's severe impairments or the removal of special conditions related to his severe impairments. (Tr. at 34.) There are two problems with this finding.

First, nothing in SSR 05-2p states that the impairment which forced the claimant to stop working must be "severe" or satisfy the duration requirement under step-two of the sequential evaluation. See 20 C.F.R. § 404.1520(a)(4)(ii). Such a requirement would conflict with the equitable purpose of the UWA concept – disregarding relatively brief work attempts that do not demonstrate sustained SGA. See SSR 05-2p, 2005 WL 6491604, at *1. It would also contravene the general rule that the ALJ must consider the aggregate effects of a claimant's impairments, including impairments that, in isolation, are not severe. See Golembiewski v. Barnhart, 322 F.3d 912, 918 (7th Cir. 2003); see also Arnett v. Astrue, 676 F.3d 586, 592 (7th Cir. 2012). Here, it is undisputed that plaintiff was terminated from the telemarketer position due to a respiratory illness for which he received medical treatment from Dr. Carlson. (Tr. at 607.)[24]

Second, even if the UWA must end due to a severe impairment, the ALJ failed to consider the impact of plaintiff's severe obesity on his respiratory symptoms. The Commissioner has acknowledged that obesity "commonly leads to, and often complicates, chronic diseases of the cardiovascular, respiratory, and musculoskeletal body systems." SSR

_____

[24]The Commissioner contends that the job ended due to excessive absences caused by a respiratory illness that had no medical evidentiary support. That is incorrect. Plaintiff saw Dr. Carlson on March 15, 2007 – shortly before his termination from the telemarketer job – for his respiratory symptoms. (Tr. at 607.) Dr. Carlson again treated plaintiff for suspected bronchitis on June 17, 2011. (Tr. at 703.)

02-1p, 2002 WL 34686281, at *2. In examining plaintiff's lungs on March 15, 2007, Dr. Carlson specifically noted that plaintiff was "a very large man over 400 pounds." (Tr. at 607.) The ALJ should have considered whether the respiratory symptoms resulting in plaintiff's termination were exacerbated by his severe obesity. The DVR records the ALJ skipped also contain relevant information. In reviewing plaintiff's vocational options, "it became apparent that [plaintiff's] excessive absenteeism would preclude most, if not all occupations. Absenteeism occurs for a variety of reasons (poor sleep/fatigue, hypertension associated symptoms, respiratory concerns) with the most troubling being the unpredictable back spasms that seem to occur for 'no reason'." (Tr. at 462.)

### 2. Learning to do the Job (Duration)

#### a. Applicable Legal Standards

"Duration refers to the length of time during which the person gained job experience. It should have been sufficient for the worker to have learned the techniques, acquired information, and developed the facility needed for average performance in the job situation. The length of time this would take depends on the nature and complexity of the work." SSR 82-62, 1982 WL 31386, at *2; see also 20 C.F.R. § 404.1565(a).

#### b. Analysis

In the present case, the ALJ found "that two months is long enough to learn to do this work, so it is also past relevant work." (Tr. at 34.) However, he provided no explanation for that finding and cited no vocational evidence. At plaintiff's hearing, the vocational expert testified that the telemarketer job was semi-skilled, with an "SVP" ("specific vocational preparation") of 3. (Tr. at 156.) Jobs with an SVP level of 3 require over one month up to and

including three months to learn. http://www.onetonline.org/help/online/svp. Thus, it cannot be assumed that plaintiff learned the telemarketer job in six to eight weeks.

The Commissioner notes that, according to the employer's records, plaintiff completed training from January 29, 2007 to February 9, 2007, and worked for over a month after that, with no evidence that he failed to learn the job by his termination date of March 21, 2007. However, the ALJ did not rely on the employer's records in making his finding. "[R]egardless whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for [his] decision and confine [judicial] review to the reasons supplied by the ALJ." Steele v. Barnhart, 290 F.3d 936, 941 (7th Cir. 2002). Moreover, a finding that a two week training period sufficed to learn the telemarketer job would conflict with the DOT and the VE's testimony. "Past work experience must be considered carefully to assure that the available facts support a conclusion regarding the claimant's ability or inability to perform the functional activities required in this work." SSR 82-62, 1982 WL 31386, at *3. The ALJ's one-sentence assertion that two months is long enough to learn to do this job is insufficient.[25]

---

[25]Plaintiff also argues that the ALJ offered only a perfunctory analysis of the Listings. See Barnett v. Barnhart, 381 F.3d 664, 668 (7th Cir. 2004). As plaintiff concedes, however, any error in articulation at step three would be harmless unless he can explain how the ALJ's failure might make a difference in the outcome of the case. See Prochaska v. Barnhart, 454 F.3d 731, 736 (7th Cir. 2004); Ramos v. Astrue, 674 F. Supp. 2d 1076, 1092 (E.D. Wis. 2009). In his main brief, plaintiff discusses limitations related to his obesity, but he fails to relate them to any Listing. In his reply brief, he mentions Listings 1.01, 1.04, and 9.00(B)(5), but arguments raised for the first time in reply are waived. E.g., Darif v. Holder, 739 F.3d 329, 336 (7th Cir. 2014). In any event, plaintiff fails to link any of his obesity-related limitations to the criteria of these Listings. See 20 C.F.R. § 416.926(a) ("Your impairment(s) is medically equivalent to a listed impairment in appendix 1 of subpart P of part 404 of this chapter if it is at least equal in severity and duration to the criteria of any listed impairment."). Therefore, I cannot find reversible error in the ALJ's step three analysis.

## IV. CONCLUSION

"Courts have the statutory power to affirm, reverse, or modify the Social Security Administration's decision, with or without remanding the case for further proceedings." Allord v. Astrue, 631 F.3d 411, 415 (7th Cir. 2011) (citing 42 U.S.C. § 405(g)). This includes the ability to remand with instructions for the Commissioner to calculate and award benefits to the claimant. Id. (citing Campbell v. Shalala, 988 F.2d 741, 744 (7th Cir.1993)). "An award of benefits is appropriate, however, only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion – that the applicant qualifies for disability benefits." Id. (citing Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 355 (7th Cir. 2005)).

Plaintiff seeks remand for an award of benefits (rehearing in the alternative), but not all of the relevant issues have been resolved. It is true that, as of age fifty, plaintiff would qualify for benefits under the Grid at step five. However, he must first pass step four; as discussed above, it is unresolved whether plaintiff's telemarketer job qualifies as past relevant work. The ALJ must on remand resolve the disputed issues regarding earnings, UWA, and duration. As also discussed above, the ALJ must on remand reconsider Dr. Carlson's opinion and plaintiff's testimony; if accepted, this evidence would preclude performance of the telemarketer job even if it is past relevant work.

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **REVERSED**, and this matter is **REMANDED** to the Commissioner for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four. The Clerk is directed to enter judgment

accordingly.

Dated at Milwaukee, Wisconsin this 5th day of May, 2014.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge